ALASKA COMMERCIAL FISHING & AGRICULTURE BANK, and Foss Shipyard, a division of Foss Launch & Tug Co., Plaintiffs,

Deep Sea Fisheries, Inc., Plaintiff in Intervention,

v.

O/S ALASKA COAST, Official No. 612616, its engines, rigging, tackle, gear, furniture, equipment, and appurtenances, and Lloyd W. Collins and Sherron L. Collins, and Alaska Coast Fisheries, Inc., Defendants,

State of Alaska, Department of Public Safety, Division of Fish and Wildlife Protection, Claimant.

No. S–892.

Supreme Court of Alaska.

March 14, 1986.

James M. Gorski, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for plaintiff, Alaska Commercial Fishing & Agriculture Bank.

James B. Friderici, Delaney, Wiles, Hayes, Reitman & Brubaker, Anchorage, for plaintiff, Foss Shipyard.

Marilyn J. Kamm, Lane Powell, Barker & Hicks, Anchorage, for plaintiff in intervention, Deep Sea Fisheries.

Kathleen McGuire, Asst. Atty. Gen., Anchorage, Norman C. Gorsuch, Atty. Gen., Juneau, for claimant, State of Alaska, Department of Public of Safety.

No appearance by defendants.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

BURKE, Justice.

### I. INTRODUCTION

Pursuant to Alaska Appellate Rule 407,[1] the United States District Court for the

---

1. Alaska Appellate Rule 407(a) provides:

The supreme court may answer questions of

District of Alaska ("District Court") has certified a question for our interpretation of Alaska law. In this opinion, we determine whether the Alaska Commercial Fishing and Agriculture Bank ("CFAB") is a state agency for purposes of maritime lien foreclosure proceedings.[2] We conclude that CFAB is not a state agency for such purposes.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The certified question arises out of multi-party litigation involving the O/S Alaska Coast.

On July 25, 1984, CFAB filed its complaint *in rem* and *in personam* in District Court. CFAB sought to foreclose a claimed preferred ship mortgage. Foss shipyard ("Foss") intervened on August 17, 1984, seeking to foreclose a claimed maritime lien. The State of Alaska ("State") filed a claim on August 20, 1984. The State claimed that it held a mortgage from the Collins', previous owners of the O/S Alaska Coast, superior to CFAB's. The State also alleged numerous defects in CFAB's mortgage. The State amended its claim on October 8, 1984. It further claimed that the state court forfeiture decree gave it priority over all the maritime liens. Deep Sea Fisheries ("Deep Sea") then intervened on November 1, 1984, to foreclose its claimed maritime liens.

Foss argues that CFAB should be considered part of the State, *i.e.*, an agency of the State. Foss thus charges CFAB with

law certified to it by ... a United States district court, when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of this state.

2. The District Court specifically asked, "Is the Alaska Commercial Fishing and Agriculture Bank an agency of the State of Alaska?" The court, however, stated: "The Alaska Supreme Court is, of course, free to restate the issue in any terms which it may choose." We prefer to avoid an abstract discussion of CFAB's status.

constructive knowledge at the time of the 1981 mortgage of alleged prior fishing violations by the Collins' involving the Alaska Coast. Foss claims that CFAB had access to such information through the State law enforcement agencies' criminal computer files. Foss also claims that CFAB's preferred ship mortgage merged with the State's foreclosure interest. Since, Foss alleges, CFAB is part of the State, the merger of CFAB's equitable lien with the State's legal title extinguished the equitable interest. Both the State and Deep Sea initially agreed with Foss' argument.[3]

The District Court informs us that any extinguishment of CFAB's preferred ship mortgage would give Foss and Deep Sea liens enforceable against the vessel superior to any remaining interest of CFAB. If CFAB's mortgage did not merge, however, its foreclosure would wipe out all claims of other parties since the mortgage debt exceeds the vessel's fair market value.[4] Since a dispositive ruling of extinction by merger depends upon a finding that CFAB is a state agency, the District Court determined that this court was best suited to determine CFAB's status under Alaska law.

## III. CFAB'S STATUS

On several previous occasions, this court has analyzed in detail the status of purported state agencies. In no case have we addressed the status issue purely in the abstract. Rather, on each occasion, we have considered the entity's status solely

*See infra* note 5. Therefore, we have confined our discussion to the narrower question of CFAB's status for purposes of these maritime lien foreclosure proceedings.

3. After certification, the State reversed its position. It now agrees with CFAB that CFAB is *not* a state agency. Deep Sea continues to support Foss.

4. CFAB claims a mortgage balance of $1,650,000. Foss asserts a lien of $96,814 plus interest. Deep Sea seeks $122,750.60 plus interest. At an interlocutory sale, held on January 2, 1985, no bids were received for the minimum specified price of $600,000.

for the narrow purposes necessary to that litigation.[5] The cases document the factors we use to analyze the relationship between the state and a state authorized entity.

In *DeArmond v. Alaska State Development Corp.*, 376 P.2d 717 (Alaska 1962), we considered the constitutionality of the legislation creating and funding the Alaska State Development Corporation ("ASDC").[6] The legislature created the ASDC to make development loans for business and industry. *Id.* at 723. We first concluded that the creation and funding of the ASDC fulfilled a proper public purpose. *Id.* We then considered whether the act creating the ASDC violated the constitution by creating an overly independent agency.[7] The act specifically provided that the "corporation is an instrumentality of the state within the Department of Commerce, but has a legal existence independent of and separate from the state." *Id.* at 724. Appellant charged that lack of state direction over the corporation meant that the ASDC was not " 'within' the Department of Commerce or any of the other principal departments of the state government." *Id.* We disagreed. *Id.* at 724–25.

To reach our conclusion that the ASDC was "within" the Commerce Department, we catalogued the controls over the ASDC. We had already noted how the act itself expressly evinced the legislative intent to locate the agency within the Commerce Department. *Id.* The act made the Commissioner of Commerce a director. *Id.* We noted the potential for the commissioner's considerable influence and oversight over

---

5. For example, in *University of Alaska v. National Aircraft Leasing, Ltd.*, 536 P.2d 121 (Alaska 1975), we decided that the University was a state agency under the statute barring trial by jury in actions against the state. That decision did not foreclose separate inquiry into the University's status in *Carter v. Alaska Public Employees Ass'n*, 663 P.2d 916 (Alaska 1983). In *Carter*, we concluded that the University was a state agency for purposes of AS 09.25.110, a statute requiring disclosure of public records. *In University of Alaska v. Geistauts*, 666 P.2d 424 (Alaska 1983), we considered the University's status for yet another purpose: we held that a University committee was an agency for purposes of AS 44.62.310, a statute that requires public agencies to hold open meetings.

While we reached the same conclusion in each of these three cases, each circumstance required independent analysis. Therefore, we look here to CFAB's status for purposes of the pending admiralty foreclosure proceedings only. To the extent that *Northwest Arctic Regional Educ. Attendance Area v. Alaska Public Service Employees, Local 71*, 591 P.2d 1292, 1297 (Alaska 1979) contains language to the contrary, we disapprove it. In that case, a teacher's union sought to bind a regional education attendance area ("REAA") to a collective bargaining decision made by the REAA's predecessor, the Alaska State Operated School System ("ASOS"). The parties disputed the applicability of the Public Employment Relations Act ("PERA") to noncertificated employees of the REAA. *Id.* at 1293. The ASOS had elected to bargain with the employees under PERA; the REAA, however, claimed an exemption under PERA, as a "school district." *Id.* at 1296–97. A portion of the case turned on whether the ASOS had itself been a school district. *Id.* at 1297.

We had previously determined that the ASOS was a state agency for purposes of the civil rules governing service of process and pleadings. *Alaska State Operated School System v. Mueller*, 536 P.2d 99, 104 (Alaska 1975). We had also determined that employees of the ASOS' predecessor were state employees. *Begich v. Jefferson*, 441 P.2d 27, 34 (Alaska 1968). We acknowledged that neither of these cases *determined* the status of the ASOS under the PERA. 591 P.2d at 1297. We also properly acknowledged that the two cases *implied* that the ASOS "was a state agency for purposes other than the Civil Rules." *Id.* We then, however, immediately stated that "it follows that the ASOS was a state agency subject to the PERA." *Id.* While the result was correct, the differences between the purposes of the PERA and the civil rules warranted more discussion. While precedent supported the implication, it did not necessarily compel the result. In any event, we did not rule that the ASOS was a state agency for all purposes; rather, we confined our holding to the PERA.

6. Former AS 44.59, repealed by ch. 106, § 78, SLA 1980.

7. Alaska Constitution, art. III, § 22 states:

All executive and administrative offices, departments, and agencies of the state government and their respective functions, powers, and duties shall be allocated by law among and within not more than twenty principal departments, so as to group them as far as practicable according to major purposes. Regulatory, quasi-judicial, and temporary agencies may be established by law and need not be allocated within a principal department.

ASDC activities. *Id.* We noted that the governor appointed *all* of the remaining six directors to serve solely at the governor's pleasure. *Id.* We noted that the agency had to report annually to the governor and the legislature. *Id.* The act also required both the legislative auditor *and* the state bank examiner to audit the agency annually. *Id.* We finally observed that the legislature had to approve the final dissolution of the agency. *Id.*

We considered the agency's separate corporate status as a neutral factor. We stated that "[t]his is nothing more than a declaration of the legal relationship that most corporations have with respect to their creators." *Id.* On the whole, the broad discretion held by the agency over the choice of particular loans did not outweigh the "considerable control ... retained in the executive branch." *Id.* Thus, we concluded that the ASDC was an instrumentality of the state "within" the Department of Commerce. *Id.* at 724–25.

In *Walker v. Alaska State Mortgage Ass'n,* 416 P.2d 245 (Alaska 1966), we considered a similar constitutional challenge to the Alaska State Mortgage Association ("ASMA").[8] The legislature created ASMA to finance housing for buyers unable to obtain market loans. *Id.* at 248. Again, the appellant charged that ASMA was not "within" the Department of Commerce. *Id.* at 249. We again disagreed. *Id.*

We applied the *DeArmond* factors. The statute expressly located the agency within the Commerce Department. *Id.* ASMA had to send comprehensive annual reports to the legislative auditor. *Id.* ASMA had to send certified copies of each meeting's minutes to the governor. *Id.* at 249–50. Again, the commissioner of commerce was a permanent ASMA director and the governor appointed the remaining directors to serve at his pleasure. *Id.* at 250.

In *Alaska State Housing Authority v. Dixon,* 496 P.2d 649 (Alaska 1972), we held that the Alaska State Housing Authority

("ASHA")[9] was a state agency for purposes of the Administrative Procedures Act ("APA").[10] The legislation creating ASHA expressly located it "within" the Commerce Department. *Id.* at 651. The commerce commissioner was an ASHA director and the governor appointed the remaining directors to serve at his pleasure. *Id.* ASHA had to submit annual reports to the Commerce Department. *Id.* Finally, we noted that nothing in the APA expressly excluded ASHA from its provisions. *Id.* We concluded that the APA applied to ASHA.

Two opinions issued on the same day represent our most recent elaborations of the status of a state agency. In *University of Alaska v. National Aircraft Leasing, Ltd.,* 536 P.2d 121 (Alaska 1975), we concluded that the statutory ban on jury trials in actions against the state extended to suits against the University of Alaska.

Article VII of the constitution expressly creates the University. We noted that both this constitutional provision and legislative enactments grant the University a broad degree of autonomy *Id.* at 123–24. The University holds title to real property in its own name. *Id.* at 123. The board of regents appoints the president, formulates policy, fixes compensation, awards degrees, manages University assets, and selects and leases University lands. *Id.* at 123–24. Finally, the University can sue and be sued in its own name. *Id.* at 127.

We additionally noted, however, the considerable controls retained by the state. The governor nominates and the legislature confirms all appointments to the regents. *Id.* at 124. The regents must report annually to both the legislature and the governor. *Id.* The regents must deposit all funds received for university expansion from a sale or lease of university lands in an account held by the Revenue Department. *Id.* Finally, we noted that the legislature contributed almost two-thirds of the annual budget in 1974. *Id.*

---

8. Former AS 44.56, repealed by ch. 164, § 1, SLA 1975.

9. AS 18.55.010–290.

10. AS 44.62.010–650.

As in *DeArmond* and *Dixon,* we reiterated the rule that independent corporate status did not prevent a finding of state agency. Instead, we stated that "the guideposts for such an inquiry are to be found more in political and functional realities than in organizational formalities." *Id.* at 125–26. We concluded that the University had a "unique corporate character ... and that it was created to pursue the governmental task of providing education in accordance with an express mandate of the constitution, the fundamental and basic government of this state." *Id.* at 127–28.

*Alaska State Operated School System v. Mueller,* 536 P.2d 99 (Alaska 1975), represents our most elaborate discourse on the attributes of a state agency. Like *University of Alaska,* it involved "the clearly governmental function of furnishing education...." 536 P.2d at 102. The parties disputed whether the civil rules for service of process and pleadings upon a state instrumentality[11] applied to the Alaska State Operated School System ("ASOS").[12]

We initially noted the autonomy enjoyed by ASOS. We noted its separate corporate status, its capacity to sue, and its powers to hold property, contract, adopt administrative rules, and accept governmental grants or loans. *Id.* at 101. We then, however, exhaustively listed the control retained over it. We traced the source of all its powers to statute. *Id.* We noted that the governor nominated and the legislature confirmed all appointments to the ASOS board. *Id.* All directors served at the governor's pleasure and the governor approved the president's salary. *Id.* at 101–02. The State Personnel Act covered all employees. *Id.* at 102. The directors had to send annually an audit to the educational commissioner. *Id.* The Education Department had final say over all plans for open-

ing or closing schools. *Id.* Ultimate title to all ASOS property remained vested in the state. *Id.* Finally, the Department of Public Works had to perform all construction required by ASOS. *Id.*

Faced with this battery of "functional and organizational connections with [the state]," we concluded that "the scales weigh heavily in favor of the conclusion that for the purposes of the applicability of Civil Rule 4(d)(7) and (8), ASOS is an instrumentality or agency of the state as opposed to being an entity which is 'independent' of it." *Id.* at 102.

 Our previous decisions thus require us to balance an entity's autonomy against the state's retained control. We note initially that mere creation of an entity by the state does not make that entity an instrumentality of the state. Otherwise, all corporations would be state agencies since a corporation ultimately derives its power from statute.[13] Likewise, the mere retention of some oversight by the state over such an entity will not transform it into a state agency. Again, the state retains control over numerous aspects of corporate existence.[14] Following *DeArmond,* we consider corporate status a neutral factor that neither precludes nor mandates a finding of state "agency."[15]

In this case, we note CFAB's connections to the state. Unlike most corporations, CFAB was expressly created by the legislature through passage of an organic act. AS 44.81.010–350. The legislature declared that CFAB exercises its powers "for a public purpose." AS 44.81.010(a). CFAB can give the lenders and federal agencies the state's pledge that the state will not alter CFAB's contractual powers. AS 44.81.160. The legislative auditor, who otherwise au-

---

**11.** *See* Civil Rule 4(d)(7) & (8).

**12.** Former AS 14.08, repealed by ch. 124, § 1, SLA 1975.

**13.** *See* Title 10, Alaska Statutes.

**14.** *See, e.g.,* AS 10.05.018(3), AS 10.05.519–534, AS 10.05.777.

**15.** Similarly neutral is CFAB's capacity to sue and be sued under AS 44.81.210(6). Corporations normally hold this power. *See University of Alaska,* 536 P.2d at 127 n. 35. We decline to rule whether the state is a necessary or proper party to a suit by or against CFAB. *See* AS 44.80.010.

dits state agencies,[16] may audit CFAB. AS 44.81.270.

In addition to these points, we also note additional connections with the state. The state authorized the initial funding for CFAB by a purchase of preferred, nonvoting shares. AS 44.81.010(b)–(c). Moreover, the governor appoints two of the seven members until CFAB repurchases the state's CFAB shares. AS 44.81.020(a). In addition, the legislature has limited a director's compensation. AS 44.81.110. CFAB's annual report must include any information that the legislature requests. AS 44.81.200. Finally, the commissioner of commerce and economic development retains the authority to dissolve CFAB if CFAB fails to repurchase the state's shares within twenty years from the State's initial purchase. AS 44.81.010(b).

Several factors demonstrate CFAB's autonomy. Unlike the agencies in *DeArmond, Walker,* and *Dixon,* CFAB is not expressly "within" any executive department. In those cases as well as in *ASOS* and *University of Alaska, all* the governing board members were appointed by the governor; in all but *University of Alaska,* the board members served solely at the governor's pleasure. Here, the governor can only appoint two of seven board members, and then only until CFAB repurchases the state's preferred, nonvoting shares. AS 44.81.020(a). CFAB's members elect the other five directors. *Id.* CFAB annually reports only to its members, not directly to the state. AS 44.81.200. Moreover, the state asserts and Foss does not deny that CFAB does not receive funds annually from the state budget.

In addition, we note further evidence of autonomy. The section authorizing the legislative auditor to review CFAB states that such an audit "may" occur, not that it "shall" occur. AS 44.81.270. The legislature expressly excluded CFAB employees from the definitions of state employees and employees of a public organization. AS

44.81.070(c). The CFAB stock purchased by the state lacks voting rights. AS 44.81.-010(b). The state is not CFAB's only investor; no one can receive a loan from CFAB without purchasing membership shares or otherwise becoming a partner. AS 44.81.-210(a)(1) and AS 44.81.350(3). Finally, upon repurchase of all the state owned shares, CFAB will become a solely member-owned private cooperative corporation. AS 44.81.220. This last section also exempts CFAB from the normal restrictions on bank activity by private cooperatives. *Id.* The section exemplifies CFAB's uniqueness: the legislature intended CFAB's special role in the Alaska economy to continue long after any direct government involvement ceases.

CFAB directs us to the strongest evidence of the legislature's intent to create a unique, independent entity. In 1981, the legislature became concerned with CFAB's ability to borrow funds through the Federal Farm Credit System's Bank of Cooperatives in Spokane. The Bank of Cooperatives was CFAB's primary source of funds. Apparently, CFAB could not borrow funds from the bank if CFAB was a public agency. The legislature considered a series of amendments to AS 44.81.010 designed to clarify CFAB's status as a private entity. *See generally, Hearings on H.B. 413,* House Judiciary Committee, April 10 & April 24, 1981 ("Hearings"). The legislative history contains many remarks by representatives demonstrating a legislative intent to reduce the ambiguities in CFAB's relationship to the state. For example, during house judiciary committee hearings, Representative Miller stated:

> The whole thrust of the [legislation creating CFAB] was for us to create essentially private entities ... the thrust was to be ... really a private enterprise operation ... started with a state loan ... we wanted to create a private entity that could take advantage and leverage an

**16.** *See* AS 24.20.271.

awful lot of money that was available through this national system.[17]

Hearings, April 24, 1981 (Statement of Rep. Miller). During the same hearing, Representative Clocksin stated:

> I don't think that anyone can seriously say that if this legislation passes with this amendment [amending section 3 regarding compensation of Board members] that we aren't making an absolutely clear legislative decision to separate CFAB from the state and create it as a private organization for most purposes ...

Hearings, April 24, 1981 (statement of Rep. Clocksin).

The 1981 amendments substantially changed CFAB's organic act. Ch. 109, §§ 1–12, SLA 1981. Most importantly, the legislature deleted two references to the state in former AS 44.81.010(a). Prior to the amendments, this section stated:

> There is established the Commercial Fishing and Agriculture Bank. The bank is a public corporation and government instrumentality in the Department of Commerce and Economic Development but has a legal existence independent of and separate from the state. The exercise by the bank of the powers conferred by this chapter is considered an essential governmental function of the state. Except as otherwise provided in this chapter, the bank is subject to the provisions of AS 10.15.005–10.15.600.[18]

Ch. 159, § 3, SLA 1978 (emphasis added). The 1981 legislation, however, substituted the following section:

> (a) There is established the Alaska Commercial Fishing and Agriculture Bank. [THE BANK IS A PUBLIC CORPORATION AND GOVERNMENT INSTRU-

MENTALITY IN THE DEPARTMENT OF COMMERCE AND ECONOMIC DEVELOPMENT BUT HAS A LEGAL EXISTENCE INDEPENDENT OF AND SEPARATE FROM THE STATE.] The exercise by the bank of the powers conferred by this chapter is considered *to be for a public purpose* [AN ESSENTIAL GOVERNMENTAL FUNCTION OF THE STATE]. Except as otherwise provided in this chapter, the bank is subject to the provisions of AS 10.15.005–10.15.600.[19] The bank is exempt from the provisions of the Alaska Banking Code (AS 06.05) in the exercise of powers granted by this chapter.

(Bracketed material deleted, underscored material added by the 1981 act.) The 1981 act also stated that CFAB employees are not state employees, and that CFAB directors are not to be reimbursed as though they were members of state boards Ch. 109, §§ 2 & 3, SLA 1981.[20]

We think that the legislative history of the 1981 act demonstrates that the legislature considers CFAB a private entity for most purposes. When possible, we construe a statute as consistent with the express legislative intent.[21] We believe that the 1981 amendments effectively enacted this legislative intent. CFAB has few of the state ties that we found dispositive in *DeArmond*, *Walker*, and *Dixon*; CFAB does not resemble the instrumentalities discussed in *ASOS* or *University of Alaska*.

## IV. CONCLUSION

■ In the limited context of these maritime lien foreclosure proceedings, we find persuasive the strong legislative intent to confer a full measure of independence upon

---

**17.** Representative Miller had also served in the legislature during the passage of the legislation creating CFAB.

**18.** Alaska Cooperative Corporation Act, AS 10.15.005–AS 10.15.600.

**19.** *See supra* note 18.

**20.** The 1981 act also clarified CFAB's status as a cooperative corporation, ch. 109, §§ 4, 5, 7, SLA 1981. The act imposed confidentiality require-

ments upon CFAB records and authorized legislative audits. *Id.* at §§ 4–8.

**21.** Anchorage Municipal Employee's Ass'n v. Municipality of Anchorage, 618 P.2d 575, 580 (Alaska 1980). *See also City and Borough of Sitka v. International Brotherhood of Electrical Workers, Local 1547,* 653 P.2d 332, 336 (Alaska 1982).

CFAB. In its 1981 amendments, the legislature clarified its decision to stimulate the Alaska fishing and farming industries by creating and helping fund a private bank eligible for federal loans. CFAB's business purposes thus required the independence of its operation from the state. Accordingly, we rule that the District Court should consider CFAB to be an entity separate from the state for purposes of the pending foreclosure proceedings.

MOORE, J., not participating.