M–K ENGINEERING CO., INC., former-
ly International Engineering, Inc., a
Nevada corporation, Plaintiff,

v.

ALASKA POWER
AUTHORITY, Defendant.

No. A85–307 Civil.

United States District Court,
D. Alaska.

May 12, 1986.

Kenneth D. Jensen, Jensen, Harris & Roth, Anchorage, Alaska, for plaintiff.

Bruce Tennant, Asst. Atty. Gen., State of Alaska, Anchorage, Alaska, for defendant.

### ORDER

HOLLAND, District Judge.

In July of 1980, the Alaska Power Authority (herein "the APA") entered into a contract with International Engineering Company, Inc. ("IECO"), a wholly-owned subsidiary of Morrison-Knudsen Company, Inc. ("M–K"), for the design and construction management of the Tyee Lake hydroelectric project. A subsequent amendment of that contract embodied an agreement between IECO and M–K under which management of the project was transferred to M–K.

M–K filed suit in this Court in June of 1985 for breach of contract, failure to pay, promissory estoppel, and bad faith on the part of the APA.[1] Pending before this Court is the APA's motion to dismiss for lack of subject matter jurisdiction. The Court has considered the pleadings and heard the parties in oral argument.

1. Four days later, the APA filed suit in state court against IECO and M–K, alleging negligence and breach of contract and warranty arising out of the same contract. The defendants there promptly removed that case to the federal court (No. A85–348 Civil). A motion to remand that case is also before this Court. The issues in both cases are virtually identical. A related order is being entered in that case.

■ M–K bases its complaint in this Court's diversity jurisdiction. Because the federal courts are of limited jurisdiction, there is a presumption against the exercise of diversity jurisdiction, and the party seeking to establish that jurisdiction bears the burden of pleading the citizenship of every party to the action. *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 792 (9th Cir. 1983). No presumptive truthfulness attaches to M–K's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims. *Thornhill Publishing Co. v. General Telephone & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir.1979).

In arguing for dismissal, the APA asserts that this Court lacks subject matter jurisdiction over this dispute. The APA contends that it is an agency of the State of Alaska and that it cannot be a citizen of the state within the language of 28 U.S.C. § 1332, which confers jurisdiction over certain civil actions between citizens of different states. In what is basically the same argument, the APA also asserts that, as an agency of the state, it has eleventh amendment sovereign immunity and may not be sued by citizens of another state in federal court. M–K opposes dismissal by arguing that, since the APA is a public corporation with its own separate and independent legal existence, the requirements of the diversity statute are met because the APA is an Alaska citizen. By similar reasoning, M–K arrives at the conclusion that the APA is not protected by the eleventh amendment.

■ It is well established that a state is not a citizen for purposes of diversity jurisdiction; however, a political subdivision of a state, unless it is simply an arm or alter ego of the state, is a citizen for diversity purposes. *Moore v. County of Alameda*, 411 U.S. 693, 717, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973). It is equally clear that the eleventh amendment bars suits not only against the state when it is a named party, but also when it is the party in fact. The applicability of the amendment is to be determined not by the mere names of the titular parties, but by the essential nature and effect of the proceeding as it appears from the entire record. *Scheuer v. Rhodes*, 416 U.S. 232, 237, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 474 (1974). For present purposes, the analysis of a state agency's status is virtually identical whether the case involves a determination of citizenship for diversity jurisdiction or immunity from suit under the eleventh amendment. *Tradigrain v. Mississippi State Power Authority*, 701 F.2d 1131, 1132 (5th Cir.1983); *Morrison-Knudsen Co. v. Massachusetts Bay Transportation Authority*, 573 F.Supp. 698, 705 (D.Idaho 1983); *DeLong Corporation v. Oregon State Highway Commission*, 233 F.Supp. 7, 16–17 (D.Or. 1964).

The basic question, then, is whether the state is the real party in interest. Federal law will control this analysis, but in making the determination of an agency's status, a court in this circuit must pay particular attention to the statutory scheme creating that agency and the local case law delineating its functions. *Jackson v. Hayakawa*, 682 F.2d 1344, 1350 (9th Cir.1982); *DeLong Corporation*, 233 F.Supp. at 10.

In deciding whether the APA is a political subdivision of the State of Alaska and thus properly before this Court, or whether it is merely an arm or alter ego of the state against whom suit is barred, we are instructed to evaluate a number of factors. The most critical question is whether the APA has such independent status that a money judgment against it would not impact the state treasury. *Jackson v. Hayakawa*, 682 F.2d at 1349–50. Other factors include performance by the entity in question of an essential governmental function, its ability to sue or be sued, its power to take property in its own name, and the corporate status of the entity. *Id.* Yet another significant factor is the extent of the agency's independent management authority as reflected in its power to make its own hiring decisions, enter into contracts, and engage its own counsel. *Tradigrain*, 701 F.2d at 1132.

■ The APA was created by the state legislature in 1976 as a "public corporation

of the state in the Department of Commerce and Economic Development but with separate and independent legal existence." AS 44.83.020. Its purpose is to advance the welfare of the people of Alaska by providing a means of developing and operating power projects. AS 44.83.070. The powers of the APA are specifically delineated to include, among others, the following: to sue and be sued; to acquire, operate, and maintain power projects; to issue bonds; to transfer its real and personal property; to enter into contracts; to exercise the power of eminent domain; and to recommend to the legislature the issuance of general obligation bonds, an appropriation from the general fund, and various other transactions. AS 44.83.080. Its membership is constituted of three public directors appointed by the governor and confirmed by the legislature, as well as four other directors (the Director of the Office of Management and Budget and three commissioners of principal executive departments of the State of Alaska, themselves appointed by the governor), who serve solely at the pleasure of the governor. AS 44.83.030. The APA is subject to the provisions of the Executive Budget Act, AS 37.07.010–130. AS 44.83.210(a). The purpose of that act is to establish a comprehensive system for state program and financial management which furthers the capacity of the governor and legislature to plan and finance services provided by the state for its citizens. AS 37.07.010.

Within this broad statutory scheme and relevant case law, the Court discerns a far-reaching and extensive pattern of executive and legislative control over the operations of the APA sufficiently indicative of that agency's close relationship with the state to remove it from the from the jurisdictional reach of the federal courts.

Most compelling in this determination is the close financial nexus between the APA and the State of Alaska. Pursuant to the Executive Budget Act, the APA must annually file with the Office of Management and Budget and the legislative finance division an extensive annual report detailing goals and objectives, receipts, and budget requirements. AS 37.07.050. Numerous other provisions of that Act create an extensive pattern of ties between the APA and the legislative and executive branches. For example, after the APA receives its annual appropriation, it may not increase salaries or add employees without legislative approval. AS 37.07.080(d). Nor may the APA transfer appropriations without supporting legislation. AS 37.07.080(e).

Even the most cursory analysis of the sources of the APA's funding reveals that by far the greatest percentage of its monies are direct state appropriations, with much of the remainder arising from appropriations that are only less direct. Of the $1.4 billion appropriated since the APA's inception, almost 68% consists of direct state appropriations. Of the remaining funds, a little less than half represents advances from a power development revolving loan fund, itself a state appropriation, to finance the four-dam project of which the Tyee Lake operation is one; the remainder is tied up in variable rate demand notes associated with construction financing for another project. The Court also notes that, as part of the Department of Commerce and Economic Development, the APA must compete directly with other programs in that department for its appropriations.

At oral argument, the revenues of the APA were the subject of discussion. The Court was informed that all revenues of the APA are pledged to debt service; however, there are net proceeds from operations in excess of actual debt payments. Pursuant to Article IX of the Alaska Constitution[2], these net operating revenues

2. Article IX, section 7, of the Constitution of the State of Alaska provides:

The proceeds of any state tax or license shall not be dedicated to any special purpose, except as provided in section 15 of this article or when required by the federal government for state participation in federal programs. This provision shall not prohibit the continuance of any dedication for special purposes existing upon the date of ratification of this section by the people of Alaska....

This section has been construed to mean that all state revenues, with exceptions not here relevant, are to be paid into the state's general fund

are deposited into the general fund of the State of Alaska. The APA receives money for maintenance and operation of its facilities from legislative appropriations.

Additionally, it appears that based upon Article IX, funds left over from APA projects are lapsed into the state's general fund for later reappropriation. Indeed, funds for claims arising from the project here at issue were thus returned to the state's general fund with an alleged promise from the Governor of the State of Alaska that claims would be handled by subsequent appropriations. As a consequence, even after the actual appropriation for any given year or project, the APA's money is not really its own. This conclusion would seem also to follow from AS 37.07.080, cited above, as well as AS 44.83.392.[3]

The inescapable conclusion from the foregoing is that the APA is so intertwined with the operation of the state budgeting and appropriations process as to be virtually inseparable from the state. In light of the fact that all funds generated by the four-dam project go either to debt service or into the general fund, it is clear that, without a further appropriation from the state legislature, the APA does not have money of its own to pay a judgment taken against it. Moreover, as discussed below, the Court concludes that the Alaska courts would permit a judgment holder to proceed against the state. For present purposes, we hold only that the APA is a state agency for purposes of diversity jurisdiction and/or eleventh amendment analysis.

Nothing in M–K's arguments demands a contrary result. M–K has argued at length that the APA's bonding powers demonstrate the autonomy and independence of that agency. Indeed, the APA has been given the authority to issue bonds, AS 44.-83.080(6), AS 44.83.100(a), and the legislature has specifically provided that such bonds do not constitute an indebtedness or other liability of the state and are payable solely from the receipts of the APA, AS

44.83.130(b). While such is the case, the point does not tell the whole story. The APA's bonding authority must be seen in light of its overall economic ties to the state, detailed above. The legislature has also determined that, should the APA's bonds prove inadequate, the agency has the power to recommend the issue of general obligation bonds of the state, the pledge of the state's credit to guarantee repayment of revenue bonds, or an appropriation from the general fund. AS 44.83.080(16).

More importantly, M–K's argument regarding the bonding authority of the APA does not confront the ultimate question of who must pay for a money judgment taken against the APA for a claim not associated with bonds. M–K has not demonstrated that the APA has any source of income that could be levied upon to pay such a judgment, and it would certainly seem that any judgment taken against the agency would of necessity have to be paid as are the APA's other operating expenses: by increased appropriation from the general fund. The APA cannot, as a practical matter, sell bonds to pay a judgment; and, as set out above, the APA's revenues are pledged to debt service or go to the state's general fund from which they are returned through appropriations for maintenance and operation of the APA.

The conclusion that the APA must be treated as an arm or alter ego of the state for present purposes is bolstered by a reading of Alaska case law. In *Alaska Commercial Fishing & Agriculture Bank v. O/S Alaska Coast*, 715 P.2d 707, 708–11 (Alaska 1986), the Alaska Supreme Court reviewed its earlier cases and documented the factors used to analyze the relationship between the state and an agency. Although its analysis was for the limited purpose of determining if Alaska Commercial Fishing & Agriculture Bank ("CFAB") were a state agency for purposes of a lien foreclosure proceeding in the federal court,

to be made available for appropriation. *See State v. Alex*, 646 P.2d 203, 208–10 (Alaska 1982).

**3.** AS 44.83.392 provides:

If at the end of construction of a power project appropriations for the power project exceed the amount required for construction of it, the excess lapses into the general fund.

the process by which the court reached its conclusion is significant to the present matter.

The state court found several aspects of an agency's structure and operations to be important and controlling in the determination of agency status. Included were these: that the enabling legislation specifically placed the agency within the Department of Commerce or other state department; that the governor appointed the agency's directors; and that annual reports were to be made to the executive and legislative branches. *Id.* at 710. Still speaking generally, the state court found that an agency's separate corporate status ought to be considered a neutral factor, nothing more than a declaration of the legal relationship that most corporations have with respect to their creators. *Id.* At the same time, the state court noted that even a broad degree of autonomy—as reflected in the rights to hold property, to enter into contracts, and to sue or be sued—is not enough to support a finding of independence in the face of considerable state-retained control. *Id.* at 710–711. The state court said:

> [W]e reiterated the rule that independent corporate status did not prevent a finding of state agency. Instead, we stated that "the guideposts for such an inquiry are to be found more in political and functional realities than in organizational formalities." ...
>
> . . . .
>
> Our previous decisions thus require us to balance an entity's autonomy against the state's retained control.

*Id.* at 710, 711.

Looking at the specific characteristics of CFAB, the Alaska Supreme Court found that the corporation was sufficiently autonomous to be considered for most purposes as an entity separate from the state. On the one hand, the court noted, CFAB had been created by an organic act for an express public purpose, had received some limited state funding, and was run by directors some of whom had been appointed by the governor. On the other hand, and entitled to more weight in the court's eyes,

the organic act did not place CFAB within any state department, the governor only appointed two of the seven directors and retained even that control for a limited time, the corporation was not compelled to report to the state, it received no funding from the state, and the legislature intended that CFAB play a special role in the state's economy long after any direct government involvement ceases. While the state authorized the initial funding for CFAB by its purchase of preferred stock, those shares are nonvoting shares, and anyone seeking a loan from CFAB must purchase membership shares or otherwise become a partner. Upon the repurchase of all the state-held shares, CFAB will become a solely member-owned private cooperative corporation. *Id.* at 711–712.

In comparing and assessing the status of the APA, this Court notes the presence of all the factors cited by the Alaska Supreme Court as suggestive of close ties between the state and an agency. In addition, the present circumstances present the exact reverse of all the factors found by that court to be decisive in the determination of agency autonomy for CFAB. The APA organic act places the agency within the Department of Commerce and establishes it expressly for the purpose of the public welfare. The governor retains tight control over the appointment of directors. The corporation must report directly to both the executive and legislative branches of the state. Its funding is derived almost entirely from legislative largesse, and the agency's structure reflects the legislature's long-term commitment to the state's involvement in solving the power needs of Alaska. The APA has no private shareholders.

The Court can only conclude that the APA is so intertwined with the State of Alaska as to be inseparable. The nexus is clearly sufficient to establish that the APA cannot be considered a citizen for purposes of the diversity statute, 28 U.S.C. § 1332. The APA similarly enjoys the protections of the eleventh amendment. It follows that the APA's motion to dismiss on

grounds of subject matter jurisdiction must be granted.

The Clerk of Court shall enter an order dismissing Plaintiff's complaint without prejudice.