**ALASKA CARGO TRANSPORT, INC., Plaintiff,**

v.

**ALASKA RAILROAD CORPORATION, et al., Defendants.**

No. A90–269 Civ.

United States District Court, D. Alaska.

Nov. 18, 1991.

Ronald D. Flansburg, Boyko, Breeze & Flansburg, Anchorage, AK, for plaintiff.

William R. Hupprich, Alaska R.R. Corp., Robert C. Bundy, Richard M. Clinton, Bogle & Gates, Anchorage, AK, Thomas J. Brewer, Gregory M. O'Leary, Molly B. Burke, Heller, Ehrman, White & McAuliffe, Seattle, WA, for defendants.

## ORDER

### (Case Dismissed)

HOLLAND, Chief Judge.

The court has before it two motions to dismiss. The motions have been filed by defendants Alaska Railroad Corporation, Frank Turpin, Denny Robertson, and Laurie Gray (herein collectively "ARRC") and defendant Crowley Maritime Corporation ("Hydro–Train").[1] The motions are opposed by plaintiff Alaska Cargo Transport ("Alaska Cargo"). The court has heard oral argument, and for the reasons set forth below, the court grants both motions.

*FACTS*

The court's jurisdiction is premised on 28 U.S.C. § 1332(a)(1), diversity of citizenship.[2] Alaska Cargo, a Washington corporation is in the business of providing freight and rail car transportation services from Seattle, Washington, to Seward, Alaska. Similarly, Hydro–Train is a Washington corporation in the business of transporting freight and rail cars by barge to the port of Whittier, Alaska.[3] ARRC is an Alaska corporation which provides rail service to the cities of Anchorage, Fairbanks, Seward, and Whittier, Alaska.

Prior to 1986, Alaska Cargo based its business operations in the cities of Kenai and Anchorage. In June or July of 1986, representatives of ARRC contacted Alaska Cargo regarding a move of Alaska Cargo's business operations from Kenai and Anchorage to Seward. Alaska Cargo alleges that it was contacted by ARRC concerning the move to Seward as part of a marketing venture to increase utilization of rail services out of Seward to points north of the port.

On or about July 31, 1986, representatives of Alaska Cargo and ARRC met at a restaurant in Seattle, Washington. Present at the meeting were Dennis Robertson, vice-president of marketing for ARRC, and Laurie Gray, then sales manager for ARRC. Present for Alaska Cargo were John Harlowe, the owner, and Jeanne Macri who was acting as agent for Alaska Cargo.[4]

Alaska Cargo's complaint alleges that a verbal contract was entered into between

---

1. Crowley Maritime Corporation owns and operates Puget Sound Tug and Barge Company. Hydro–Train is an incorporated entity existing within Puget Sound Tug and Barge Company.

2. Plaintiff's complaint was filed with the court on July 5, 1990. Plaintiff's corrected second amended complaint and demand for jury trial was filed August 23, 1990. Each complaint alleges an amount in controversy pursuant to 28 U.S.C. § 1332(a)(1) in excess of $10,000. Section 1332 was amended in 1988 and now requires the amount in controversy to exceed $50,-000. See Pub.L. No. 100–702 (effective Nov. 19, 1988). Given the gravamen of plaintiff's complaint and the allegations of damages in the amount of $70 million, it is clear to the court that the amount in controversy exceeds the requirements of Section 1332. Nonetheless, plaintiff's counsel should recognize the amendment.

3. Generally, for jurisdiction to be proper, Alaska Cargo and Hydro–Train must be completely diverse. See Strawbridge v. Curtiss, 7 U.S. (3, 2 L.Ed. 435 Cranch) 267 (1806). Alaska Cargo's complaint does allege an independent ground of subject matter jurisdiction against Hydro–Train for antitrust violations pursuant to, inter alia, 28 U.S.C. § 1337. An independent ground of subject matter jurisdiction, in this instance based on 28 U.S.C. § 1331 federal question jurisdiction, defeats the complete diversity rule of Strawbridge. See Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); Brown v. Mine Safety Appliances Co., 753 F.2d 393, 395 (5th Cir.1985); 13B C. Wright, A. Miller, and E. Cooper, Federal Practice and Procedure § 3605 at 400 (2d ed. 1984).

4. The foregoing is not intended to be an exhaustive list of those present at the meeting.

Alaska Cargo and ARRC. The terms of the alleged agreement included favorable tariff rates and wharfage charges which ARRC would charge Alaska Cargo at ARRC's terminal in Seward. Alaska Cargo asserts that the existence of the contract was recognized by ARRC personnel at a later meeting held at a restaurant in Anchorage in September of 1986.

On October 30, 1986, believing that an agreement had been reached, Alaska Cargo made an initial shipment from Seattle to Seward. Things did not go according to plan, for when the Alaska Cargo barge arrived, ARRC refused to let it to dock. Relations between the two entities worsened with ARRC contending that no contract had been reached or entered into.

Alaska Cargo filed suit in this court on July 5, 1990, alleging a cause of action against ARRC for breach of contract, defamation, antitrust violations, and unfair trade practices, and seeking injunctive relief. Alaska Cargo also brought suit against Hydro–Train claiming that, on receiving notice of the favorable rates given Alaska Cargo, Hydro–Train threatened ARRC with the removal and cessation of its Whittier operations unless the arrangements with Alaska Cargo were terminated. Alaska Cargo believes the foregoing amounts to tortious interference with contract, conspiracy in restraint of trade, and an attempt to monopolize.

On November 6, 1990, ARRC filed a motion to dismiss pursuant to Rule 12(b)(1) and (6), Federal Rules of Civil Procedure, claiming that since it was an instrumentality of the State of Alaska, the Eleventh Amendment of the United States Constitution prohibits suits by state citizens against it in federal court. Additionally, the motion claims that the state action doctrine, Noerr–Pennington Doctrine, Local Government Antitrust Act, and Keough Doctrine all require that this court refrain from exercising its jurisdiction over this suit. Hydro–Train has filed a motion to dismiss urging similar arguments and concluding, under the Noerr–Pennington Doctrine, that it is also immune from suit.[5]

Alaska Cargo subsequently moved the court to take judicial notice of certain matters not put before the court during the briefing of defendants' motions to dismiss. The motion is granted; but the new information is not helpful in resolving the issues before the court.

### ARGUMENT

#### Eleventh Amendment

■ Both ARRC and Hydro–Train assert that maintenance of this suit in federal court is barred by the eleventh amendment. ARRC maintains that it is an instrumentality of the state, performing an essential governmental function, and that it is immune from suit by citizens in federal court. Alaska Cargo argues that ARRC is sufficiently independent of the State of Alaska that suit in federal court will not offend the principles of state sovereignty protected by the eleventh amendment.

■ It is axiomatic that the eleventh amendment grants states immunity from suits brought against it by its own citizens or citizens of another state in federal court in the District of Alaska. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984); *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974). The issue before the court is whether ARRC can be considered an instrumentality, or arm, of the State of Alaska so as to have immunity under the eleventh amendment. *Jackson v. Hayakawa*, 682 F.2d 1344 (9th Cir.1982). In determining whether an entity can be considered an instrumentality of the state for eleventh amendment purposes, the most crucial question is whether the agency possesses the type of independent status such that a judgment against it would not impact the state's treasury. *Id.* at 1350.

In making its argument for ARRC's independence from the state, Alaska Cargo cites

---

5. For purposes of a motion to dismiss, the complaint is construed in the light most favorable to the plaintiff and its allegations are taken as true.

5A C. Wright and A. Miller, *Federal Practice and Procedure* § 1357 (2d ed. 1990).

a myriad of statutory rules which it claims insulate the state from any liability incurred by ARRC. Specifically, Alaska Cargo relies on AS 42.40.500 which provides that any liability adjudged against ARRC will be satisfied from the revenue of the corporation, and that no creditor or other individual shall have a right of action against the state. Additionally, Alaska Cargo contends that ARRC exists in a capacity separate and distinct from the state because the state is not liable for the debts of ARRC, AS 42.40.690; that all claims and lawsuits shall be brought against ARRC and not against the state, AS 42.40.-900(c); and that ARRC is not a party to the provisions of AS 44.80.010 regarding the state as a party to any legal action.

While the foregoing authorities may appear determinative on the issue of whether the state is liable for any money damages imposed on ARRC, they are in no way completely determinative of the question of whether any money judgment will have to be paid by the state treasury. *See Mt. Healthy School District Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 573, 50 L.Ed.2d 471 (1977). The answer depends, at least in part, on the nature of the entity created by state law.

Initially, the court notes that ARRC is a public corporation created by the Alaska Legislature. In creating the entity, the legislature has determined that ARRC is an instrumentality of the state, located within the Department of Commerce and Economic Development. *See* AS 42.40.010. The Alaska Legislature has endowed ARRC with a legal existence independent of and separate from the State of Alaska, and has found that ARRC's continued operation is considered to be an "essential government function of the state." *Id.*

In examining the question of whether the State of Alaska will ultimately bear responsibility for a money judgment against ARRC, the court first turns to the argument that payment of any money judgment imposed against ARRC will not be sought from the state coffers.

Put plainly, an analysis of the Alaska Railroad Corporation Act ("ARCA") points to the conclusion that the legislature would, by appropriation, protect ARRC in the event a money judgment was awarded against it. While Alaska Cargo urges this is not so, due in part to ARRC's self-insurance, the court sees the situation differently. Upon its purchase from the United States, ARRC was intended to be self-sustaining. However, the legislature also authorized ARRC to "request, with the concurrence of the governor, a direct appropriation or grant from the legislature" in order to fulfill its legislative mandate. AS 42.40.540.

Since the date of transfer of ARRC from the United States, at a cost to the state of $22 million, the "self-sustaining" ARRC has sought and obtained approximately $16 million in support appropriations from the State of Alaska.[6] Moreover, since 1985 through November of 1990, ARRC has generated approximately $17,000 in revenue. ARRC is not as profitable as was originally hoped; and as evidence of its financial condition, ARRC keeps little cash on hand and is currently burdened by a $3 million debt due on short-term lines of credit. The court has little doubt that if faced with a large money judgment, ARRC would be compelled to turn to legislative appropriation in order to remain in business, and the legislature would have to respond favorably so that the "essential" transportation function would continue to be performed and to protect the state's very substantial investment in the Alaska Railroad. AS 42.40.010.

In determining this issue, the court finds further support for its decision in Supreme Court and Ninth Circuit precedent. While the Ninth Circuit has determined that an impact on a state's treasury is the most crucial factor in determining eleventh amendment immunity, it is not the sole factor to be considered. The answer still rests, in part, on the nature of the entity created by state

---

**6.** On a motion to dismiss pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure, the court is not restricted to the scope of the pleadings but may review evidence outside the pleadings concerning the existence of subject matter jurisdiction. *McCarthy v. United States,* 850 F.2d 558 (9th Cir.1988); *Biotics Research Corp. v. Heckler,* 710 F.2d 1375 (9th Cir.1983).

law. *Mt. Healthy School District Board of Education*, 429 U.S. at 280, 97 S.Ct. at 573; *Jackson*, 682 F.2d at 1350.

*Jackson* provides additional factors helpful in deciding whether an agency of a state should be accorded immunity under the eleventh amendment. These include: the performance by the entity of an essential government function, the ability of the entity to sue or be sued, whether the entity possesses the power to take property in its own name or in the state's name, and the relative independence of the corporate entity from the state. *Jackson*, 682 F.2d at 1350, *citing Hutchison v. Lake Oswego School District No. 7*, 519 F.2d 961, 966 (9th Cir.1975), *vacated on other grounds*, 429 U.S. 1033, 97 S.Ct. 725, 50 L.Ed.2d 744 (1977). In determining the effect of the existence of these factors, the court will look at how state law treats the governmental entity. *Jackson*, 682 F.2d at 1350; *M–K Engineering Co. v. Alaska Power Authority*, 662 F.Supp. 303 (D.Alaska 1986).[7]

In *M–K Engineering*, this court examined Alaska law and determined that the nexus between the Alaska Power Authority ("APA") and the State of Alaska was sufficiently close that suit against the APA was barred by the eleventh amendment. This conclusion was reached through an analysis of the Alaska Supreme Court's decision in *Alaska Commercial Fishing & Agriculture Bank v. O/S Alaska Coast*, herein the "ACFAB" case, 715 P.2d 707, 708–11 (Alaska 1986). Following *Jackson*, the court looks to state law to determine the extent of the agency's independence from the state. *Jackson*, 682 F.2d at 1350.

Under Alaska law, in determining whether a state agency is a citizen for eleventh amendment purposes, the court is required to balance an entity's autonomy with that of the state's retained control. *ACFAB*, 715 P.2d at 710, 711. In *ACFAB*, the Alaska Supreme Court focused on several aspects of the ACFAB's structure in determining whether it was a state agency for purposes of a lien foreclosure proceeding in federal court. This court followed those factors in conclud-

ing that the APA was an instrumentality of the state for eleventh amendment purposes, and does so again here. *M–K Engineering*, 662 F.Supp. at 307.

As with the APA, the Alaska Legislature has characterized ARRC as a public corporation and as an "instrumentality of the state". AS 42.40.010. As already observed, the operation of the railroad by the corporation "is considered an essential government function of the state." *Id.* And while Alaska Cargo maintains that under the same statute ARRC is a corporate entity independent of the state (*see* AS 42.40.010), it has been held in both state and federal forums that an agency's independent corporate status does not prevent a finding that the state agency is an alter ego of the state itself. *M–K Engineering*, 662 F.Supp. at 307, *citing Alaska Commercial*, 715 P.2d at 710, 711. Indeed, in determining an agency's status, the Alaska Supreme Court has found that "the guideposts for such an inquiry are to be found more in political and functional realities than in organizational formalities." *Alaska Commercial*, 715 P.2d at 711, *citing University of Alaska v. National Aircraft Leasing, Ltd.*, 536 P.2d 121, 127–128 (Alaska 1975). The foregoing satisfies the first prong of the *Jackson* test.

It is not disputed that ARRC, as authorized by statute, possesses structural qualities that reflect a degree of independence from the state, such as the power to hold rights to property, to sue or be sued, and to enter into contracts. Yet, these attributes, while superficially indicative of independence from the state, are insufficient under Alaska law to support a determination that the agency in question is, for eleventh amendment purposes, beyond the protection provided by the amendment. *M–K Engineering*, 662 F.Supp. at 307; *Alaska Commercial*, 715 P.2d at 710–711. While AS 42.40.350 authorizes ARRC to acquire land from the federal government, exchange land it possesses, AS 42.40.350, or, under AS 42.40.250(7), acquire or take title to land in its name, the legislature must first acquiesce to any final disposi-

---

7. As to the question of whether ARRC is a state entity, Alaska law is silent. This court's decision in *M–K Engineering* has recently addressed this issue concerning another agency created by the Alaska Legislature.

tion of these properties.[8] The property of ARRC (and its income as well) is immune from taxation. AS 42.40.910(a). ARRC has been granted the power of eminent domain under AS 09.55.240–.460. AS 42.40.385. As to this factor under *Jackson,* the state holds the power concerning any disposition of land ARRC may acquire.

The last *Jackson* factor also falls to ARRC's favor. Based on the statutes provided in ARCA, ARRC can hardly be said to be an autonomous entity, for the Alaska Legislature saw fit to retain a large degree of control over the organic activities of the corporation. AS 42.40.285 provides that ARRC may not exchange, donate, or sell its entire interest in land. It may not issue bonds, extend its lines, or lease land for a period in excess of thirty-five years, unless the legislature approves otherwise. *Id.* ARRC must also submit an oversight report to the governor and the legislature concerning any expansion or reduction in services or if a service requires an appropriation. AS 42.40.-280(5). ARRC receives expansion or operational funding through recommendations made to the legislature and the governor. AS 42.40.250(11). While ARRC may issue bonds, they can only be issued subject to legislative approval. AS 42.40.250. As already observed, the corporation may request, with the concurrence of the governor, a direct appropriation or grant from the legislature to assist in carrying out the provisions of ARCA. AS 42.40.540.

While ARRC does indeed possess a degree of independence, the court's balancing of the foregoing factors favors ARRC. But there is more. Not only is ARRC "within the Department of Commerce and Economic Development" (AS 42.40.010), ARRC's directors include the Commissioner of Economic Development and the Commissioner of Trans-

portation and Public Facilities. The other five members of its board of directors are appointed and serve at the discretion of the governor. AS 42.40.020. The members of the board and ARRC's employees are those of the state with respect to suits.[9]

Lastly, the corporation is under an obligation to file an annual report on its financial condition with both the legislature and the governor. AS 42.40.260. All of ARRC's long-range capital improvement and program plans must also be submitted to the legislature and the governor. AS 42.40.290.

This case is not distinguishable from *M–K Engineering.* In *M–K Engineering* the following factors, considered under guidance from the Alaska Supreme Court, were found to be conclusive in determining whether the APA was a state agency for purposes of eleventh amendment immunity: the legislature placed the agency within the Department of Commerce and Economic Development, the APA was established for the public welfare, the governor possessed tight control over the APA's board of directors, the corporation reported directly to the legislature and the governor, and it was funded by legislative grants which reflect the "legislature's long-term commitment to the state's involvement in solving the power needs of Alaska." *M–K Engineering,* 662 F.Supp. at 303.

The court is more persuaded by "political and functional realities" than by a few statutory formalities that point to possible independence of ARRC from the state. *ACFAB,* 715 P.2d at 711. The court thus finds that ARRC is an alter ego of the State of Alaska and is thus immune from suit in federal court. *Edelman,* 415 U.S. at 662–63, 94 S.Ct. at 1355–56.

■ While the court has determined that immunity exists under the eleventh amendment, the eleventh amendment bar to suit is

---

**8.** AS 42.40.285. Section 285 provides in full:
   *Legislative approval required.* Unless the legislature approves the action by law, the corporation may not
   (1) exchange, donate, sell, or otherwise convey its entire interest in land;
   (2) issue bonds;
   (3) extend railroad lines; this paragraph does not apply to a spur, industrial, team, switching or side track;

   (4) lease land for a period in excess of 35 years unless the corporation reserves the right to terminate the lease if the land is needed for railroad purposes.

**9.** AS 42.40.900 provides, as regards claims against ARRC, that: "the corporation and its board members and employees enjoy the same rights, privileges, and immunities as the state and state officers."

not absolute. A state may consent to suit in federal court, *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985), or Congress may, in certain cases, abrogate a state's sovereign immunity. *Dellmuth v. Muth,* 491 U.S. 223, 227, 109 S.Ct. 2397, 2400, 105 L.Ed.2d 181 (1989).[10]

■ In urging that abrogation is present, Alaska Cargo claims that, implicit in the Alaska Railroad Transfer Act, 45 U.S.C. § 1201 et seq. ("ARTA"), the United States Congress transferred the Alaska Railroad to the State of Alaska on the condition that the Alaska Railroad would be subject to the antitrust laws of the federal government (presumably to be enforced by an action in federal court). It is claimed by Alaska Cargo that the acceptance of this offer by the State of Alaska operates to abrogate the state's rights under the eleventh amendment. The court disagrees.

The fatal flaw in Alaska Cargo's argument is that it is not entirely clear from the language of ARTA that Congress conditioned transfer of the railroad to the state subject to the condition that the railroad be bound to the federal antitrust laws. Alaska Cargo relies on the following language:

> After the date of transfer to the State ... the State-owned railroad shall be a rail carrier engaged in interstate and foreign commerce subject to the jurisdiction of the Interstate Commerce Commission ... and all other Acts applicable to rail carriers subject to that chapter, including the antitrust laws of the United States.... Nothing in this chapter shall preclude the State from explicitly invoking by law any exemption from the antitrust laws as may otherwise be available.

45 U.S.C. § 1207(a)(1).

The court does not read the foregoing language as a condition to the transfer of the Alaska Railroad. More importantly, the language of the last sentence expressly leaves the door open for the state to invoke any exemption from the antitrust laws available. While there is nothing before the court evidencing an express intention by the state to invoke an antitrust exemption, as set forth in *Dellmuth,* there is equally nothing to show that Congress intended to abrogate the State of Alaska's immunity under the eleventh amendment.

In order to abrogate a state's eleventh amendment immunity, Congress must make its intention "unmistakably clear in the language of the statute." *Atascadero State Hospital,* 473 U.S. at 242, 105 S.Ct. at 3147. In analyzing whether Congress has abrogated a state's eleventh amendment immunity the court is to look to the language of the statute. *Dellmuth,* 491 U.S. at 231, 109 S.Ct. at 2402. In interpreting the statute at issue, a "general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Id.* at 231, 109 S.Ct. at 2402, *quoting Atascadero,* 473 U.S. at 246, 105 S.Ct. at 3149.

The statute before the court evidences only an intent that the Alaska Railroad be subject to the antitrust laws of the United States. ARTA is silent as to any mention or reference whatsoever of the eleventh amendment or sovereign immunity possessed by the State of Alaska. *See Dellmuth,* 491 U.S. at 231, 109 S.Ct. at 2402. In this instance, there is nothing even remotely approaching the "unmistakable clarity" that Congress is required to provide when intending to abrogate a state's immunity from suit. *Id.*[11]

Plaintiff's complaint as it relates to ARRC is dismissed for lack of subject matter jurisdiction.

---

**10.** States may also waive their eleventh amendment immunity; however, such a claim is not before the court.

**11.** An example of unmistakably clear language concerning the abrogation of a state's eleventh amendment sovereign immunity was provided by the Supreme Court in *Dellmuth* (discussing the 1986 amendments to the Rehabilitation Act).

The "unmistakably clear language" relied on by the court reads: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court...." *Dellmuth,* 491 U.S. at 229–30, 109 S.Ct. at 2401, *quoting* 42 U.S.C. § 2000d–7(a)(1) (1982 ed., Supp. IV). Such language is hardly present before the court.

## State Action Doctrine

■ In the event that state immunity is unavailable under the eleventh amendment, ARRC and Hydro–Train urge antitrust immunity for ARRC under the state action doctrine. Alaska Cargo argues that since ARRC is not an instrumentality of the state, the doctrine is inapplicable to it. The court has rejected that claim. Alternatively, Alaska Cargo urges that the doctrine does not apply to either defendant because the actions of ARRC were not undertaken pursuant to a clearly articulated and affirmatively expressed state policy which would lead to foreseeable anti-competitive consequences. The court disagrees.

In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court determined that antitrust claims did not apply to anti-competitive acts undertaken by a state in its sovereign capacity. In *Parker,* the Court considered the antitrust implications of a state statute that restricted competition among California raisin growers. Resting on "principles of federalism and state sovereignty", the Court declined to find that the Sherman Act prohibited the anti-competitive acts of a state acting through its legislature. *Hoover v. Ronwin,* 466 U.S. 558, 567, 104 S.Ct. 1989, 1994, 80 L.Ed.2d 590 (1984). ARRC claims protection under the doctrine, maintaining that its actions were undertaken pursuant to legislative authorization.

■ A state is determined to be acting in its sovereign capacity when it acts through its legislature. *Parker,* 317 U.S. at 350–51, 63 S.Ct. at 313–14. When a state legislature adopts legislation, its actions constitute those of the state and are, *ipso facto,* immune from antitrust liability. *Hoover,* 466 U.S. at 568, 104 S.Ct. at 1995; *Deak–Perera Hawaii, Inc.*

*v. Department of Transportation,* 745 F.2d 1281–82 (1984). Thus, the first issue before the court is whether the actions of ARRC can be attributed to those of the State of Alaska acting in its sovereign capacity, or whether closer analysis is required when the activity at issue is not directly that of the legislature but is carried out by others pursuant to state authorization. *Hoover,* 466 U.S. at 568, 104 S.Ct. at 1995. The court concludes that the more rigorous, two-pronged test found in *Hass v. Oregon State Bar,* 883 F.2d 1453 (9th Cir.1989), applies.[12]

In instances where the challenged activity is not, due to ARRC's corporate status, directly that of the state or the state legislature, but is carried out by others pursuant to state authorization, the court must closely analyze that activity to determine whether the anti-competitive conduct of the state's representative was contemplated by the state. *Hoover,* 466 at 568, 104 S.Ct. at 1995; *Hass,* 883 F.2d at 1457 (action of state bar association, created as corporation by legislature, was not *per se* "state action").

■ State antitrust immunity under *Parker* will be available to a "non-sovereign" entity if the challenged conduct: (1) has been undertaken pursuant to a clearly articulated and affirmatively expressed state policy to replace competition with regulation, and (2) when the challenged conduct is that of a private party, "the state must supervise actively any private conduct." *Southern Motor Carriers Rate Conference v. United States,* 471 U.S. 48, 57, 105 S.Ct. 1721, 1727, 85 L.Ed.2d 36 (1984), *citing California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980); *Hass,* 883 F.2d at 1457. If the first factor has been met, the second need not be shown. *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85

---

**12.** *Cf. Deak–Perera Hawaii, Inc. v. Department of Transportation,* 745 F.2d 1281 (1984), and *Charley's Radio Taxi Dispatch v. SIDA of Hawaii,* 810 F.2d 869 (9th Cir.1987), with *Hass.* In the cases of *Deak–Perera* and *SIDA of Hawaii,* the concern was with actions directly undertaken by the Hawaii Department of Transportation. No corporate subdivision or other legislative entity within the department was involved. In *Hass,* the alleged antitrust activity was concerned with a malpractice insurance provision promulgated by

the Oregon State Bar. The insurance provision was found not to be an act of the state in its sovereign capacity, but one undertaken by others pursuant to state authorization. *Hass,* 883 F.2d at 1456. In this instance, the court determines that the challenged activity being carried out by the Alaska Railroad is not directly that of the legislature pursuant to statute, but is undertaken pursuant to state authorization; thus the two-pronged test applies.

L.Ed.2d 24 (1985); *Hass,* 883 F.2d at 1459–61.

In considering the first factor (as to ARRC) of a clearly articulated state policy, the legislature will be deemed to have contemplated the challenged activity if the statutes confer "express authority" to take action that *foreseeably* will result in anti-competitive effects. *Town of Hallie,* 471 U.S. at 43, 105 S.Ct. at 1719; *Hass,* 883 F.2d at 1457. Alaska Cargo goes to great lengths in claiming that ARCA cannot be read to regulate the transportation industry because the state has not compelled, supervised, or limited the activity. Alaska Cargo reads the law too narrowly.

A legislature need not detail or compel the anti-competitive actions at issue, it is just as true, however, that a position of neutrality does not suffice to find the "clear articulation" requirement. *Hass,* 883 F.2d at 1458. As to this case, the court's concludes that the Alaska Legislature has clearly articulated a state policy to replace competition with regulation.

ARCA authorizes ARRC to make contracts, purchase land, and proscribe rates to be charged for services it provides. Title 42 also authorizes ARRC to determine the routes, schedules, and types of service it wishes to provide; and ARRC may, in providing those services, enter into contracts with connecting carriers, shippers, and other persons concerning its services, property, and facilities. This authority also includes the power to enter into agreements that contain provisions to preserve and expand the railroad's traffic base. AS 42.40.250(16). Lastly, AS 42.40.250(30) mandates that ARRC will "do all things necessary or desirable to carry out the powers and duties of the corporation granted or necessarily implied in this chapter or other laws of the state or the laws or regulations of the federal government."

After examining the foregoing authority, the court concludes it is entirely foreseeable that ARRC would choose those routes, schedules, and rates most likely to provide the services necessary as opposed to dealing with a competitor that, for whatever reason, is unlikely to enhance ARRC in its railroad operations. ARRC possesses the authority to enter into contracts with connecting carriers, shippers, and other persons concerning the services it wishes to provide, coupled with the authority to enter into contracts concerning the property and facilities it owns, including agreements that contain provisions to preserve and expand the railroad's traffic base. It follows, quite logically, that ARRC would favor those agreements most likely to facilitate profitable operations.[13]

ARRC is the sole provider of rail service to the people of the state of Alaska. Given the sweeping authority granted to ARRC, the court concludes that the action authorized would foreseeably result in anti-competitive effects. Generally, in order to meet the "clear articulation" test, a government agency is not required to present a specific statute or legislative authorization for either the anti-competitive conduct taken or the specific action taken. *Town of Hallie,* 471 U.S. at 42, 105 S.Ct. at 1718. A clearly articulated state policy will be deemed to have been contemplated by the legislature if the statutes confer "express authority" to take action that *foreseeably* will result in anti-competitive effects. *Id.* at 43, 105 S.Ct. at 1719; *Hass,* 883 F.2d at 1457.

Alaska Cargo argues that the foregoing falls short of a "clear articulation" requirement. The court disagrees. As to what constitutes a "clear articulation" requirement in other cases, the court relies upon *Grason Elec. Co. v. Sacramento Municipal Utility Dist.,* 770 F.2d 833, 837–38 (9th Cir.1985). There, a public utility's alleged monopolization of markets for electrical distributions

13. A recent Ninth Circuit decision, *Lancaster Hospital v. Antelope Valley Hospital,* 940 F.2d 397 (9th Cir.1991), has cautioned against mechanistically laying down the specific authorizing language in individual cases with that found in *Town of Hallie.* Under *Lancaster Hospital,* courts are to follow *Town of Hallie* by focusing on whether the state's policy is to support or supplant competition in the area of dispute. In so analyzing the dispute, the court is to pay particular attention to the foreseeable and logical consequences of a state's grant of authority. While ARRC does indeed possess a broad grant of authority, it is the court's determination that it was foreseeable that anti-competitive effects would occur as a result of that authority.

systems on private property and for street and outdoor lighting systems was found to be authorized pursuant to "clearly articulated" state policy. In *Grason,* the court's opinion was based in part on the existence of a statute authorizing the utility to acquire, construct, own, and operate works for supplying power, to fix its rates below cost, and to "do all things necessary or convenient to the full exercise of the powers" granted by the statute. ARRC is very similarly situated.

■ The court turns now to the requirement of active state supervision. This requirement "stems from the recognition that '[w]here a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State.'" *Patrick v. Burget,* 486 U.S. 94, 100, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988), *quoting Town of Hallie,* 471 U.S. at 47, 105 S.Ct. at 1720. In situations concerning state agencies, it has been held that there is little danger that the party engaging in the anti-competitive activity is pursuing any interest other than those of the state. In such cases, the active supervision requirement need not be shown. *Hass,* 883 F.2d at 1459–61; *Town of Hallie,* 471 U.S. at 46 n. 10, 105 S.Ct. at 1720 [14].

While agreeing with the foregoing rule and its application to this case, the court does not arrive at its decision automatically. In finding that there is no danger of a private arrangement, the court is persuaded by the following factors as set forth in *Hass* (883 F.2d at 1460).

ARRC is a public corporation and an instrumentality of the State of Alaska, existing within the Department of Commerce and Economic Development. AS 42.40.010. It is considered an essential government function of the state. *Id.* It is governed by a seven-member board of directors. Two members of the board are state officials; the remaining five may not be state officers or employees, but are appointees of the governor of the state. AS 42.40.020. It is the board's responsibility to provide for safe, efficient, and economic transportation to meet the overall needs of the state. AS 42.40.100(5).

The meetings of the board of directors are public, and the board is required to give public notice before each meeting. AS 42.-40.150(b). Information in possession of ARRC is public and is open to public inspection. AS 42.40.220(a). The financial records of ARRC are audited annually and are available to the public. AS 42.40.270(a), (b). Given the foregoing factors, "[w]hen the actor is a state agency subject to requirements such as those set forth above, just as when the actor is a municipality, 'there is little or no danger that it is involved in a *private ...* arrangement.'" *Hass,* 883 F.2d at 1460, *quoting Town of Hallie,* 471 U.S. at 47, 105 S.Ct. at 1720.

Inasmuch as the court has concluded that ARRC is a state agency, there is no requirement that the state actively supervise ARRC's "execution of what is a properly delegated function". *Town of Hallie,* 471 U.S. at 47, 105 S.Ct. at 1720.

As a defense to application of the state action doctrine, Alaska Cargo urges that the "conspiracy" exception, whereby ARRC conspired with private parties in restraint of trade, prevents ARRC's reliance on the doctrine. This also fails for, as the Supreme Court has recently made clear, there is no conspiracy exception to the doctrine concerning the state entity. *City of Columbia,* 499 U.S. at 374, 111 S.Ct. at 1351.

The motions to dismiss filed by ARRC and Hydro–Train as they relate to application of the state action doctrine are hereby granted.

### Noerr–Pennington Doctrine

■ Hydro–Train claims it is immune from antitrust liability under the Noerr–Pennington Doctrine. Alaska Cargo urges the doctrine is inapplicable here because ARRC, pursuant to AS 42.40.010, has a legal existence independent of and separate from the

---

**14.** *Parker* immunity is not available to private parties like Hydro–Train. Hydro–Train's relief must be sought through application of the Noerr–Pennington Doctrine. *City of Columbia v.*

*Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 377–78, 111 S.Ct. 1344, 1353, 113 L.Ed.2d 382 (1991).

state. This argument has failed. *See M–K Engineering*, 662 F.Supp. 303.

Generally, Noerr–Pennington stands for the proposition that federal antitrust laws do not regulate the conduct of private individuals seeking anti-competitive action from the government. *"Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *City of Columbia*, 499 U.S. at 380, 111 S.Ct. at 1354, *quoting United Mine Workers v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965). The rule is founded upon the concept that a contrary finding could impede the first amendment right to petition the government for grievances. *Boone v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 893–94 (9th Cir.1988).

Under Noerr–Pennington, in order not to "chill" legitimate lobbying activities, it is important that a plaintiff's complaint contain specific allegations that the Noerr–Pennington Doctrine does not apply. Conclusory allegations are insufficient to strip the defendants of the protection the doctrine provides. *Id.* at 894. Here, Alaska Cargo's complaint makes no reference to the doctrine. The court assumes for the sake of further discussion that the complaint could be amended to circumvent this problem.

Alaska Cargo's complaint alleges that ARRC, through coercion, agreement, or the prompting of Hydro–Train, allocated essential facilities and rail cars to Hydro–Train so that ARRC could earn more income.[15] Additionally, an allegation is made that the close working relationship between the two entities developed to the point that the two began "joint planning sessions" where representatives of both parties would meet to exchange ideas as to transportation issues relevant to their market area. It is also alleged that the two entities combined their knowledge and expertise in formulating market strategies by entering into contracts "in an effort to compete with Alaska Cargo".[16]

The court is therefore to determine whether the foregoing activity allegedly undertaken by Hydro–Train is immunized by Noerr–Pennington. The court finds in the affirmative.

Generally, private meetings between government officials[17] and individuals seeking to monopolize a particular market is a form of advocacy protected by Noerr–Pennington. *Boone*, 841 F.2d at 895. Moreover, evidence of a series of meetings between defendants and public officials, resulting in a contract to exclude competitors, proves nothing other than a "classic case" for application of the Noerr–Pennington Doctrine. *Boone*, 841 F.2d at 895; *see In re Airport Car Rental Antitrust Litigation*, 521 F.Supp. 568, 588 (N.D.Cal.1981), *aff'd* 693 F.2d 84 (9th Cir. 1982), *cert. denied*, 462 U.S. 1133, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983).

The doctrine does have two exceptions to its application, although neither is applicable here. The first exception arises from the existence of a "sham" campaign, where one uses the governmental process itself as an anti-competitive weapon. Therefore, Noerr–Pennington does not apply in instances where the government *process* is being abused, *e.g.*, the filing of frivolous objections to the license application of a competitor as a delaying tactic to forestall the granting of the license. *City of Columbia*, 499 U.S. at 380, 111 S.Ct. at 1354. The sham exception is directly applicable where a defendant conducts activities which are "not genuinely

---

15. If true, this would be in full accord with ARRC's legislative mandate and is fully authorized by ARCA.

16. As to the remaining claims for antitrust violations against Hydro–Train, it is alleged that ARRC and Hydro–Train entered into contracts for rates less than their costs as a predatory act in an attempt to undermine Alaska Cargo's ability to compete in the barge market; that ARRC required the release of Alaska Cargo's manifests as to critical items, then raised tariff costs for those items six times higher through Seward than through Whittier; that Hydro–Train coerced ARRC to cancel the alleged contract between Alaska Cargo and ARRC; and that, as a favor to Hydro–Train, ARRC declined to allow the shipment of hazardous material across the Seward docks.

17. As already noted, for purposes of claims, the employees of ARRC "enjoy the same rights, privileges, and immunities as the state and state officers." AS 42.40.900(b).

aimed at procuring favorable government action". *Id., citing Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n. 4, 108 S.Ct. 1931, 1937 n. 4, 100 L.Ed.2d 497 (1988).

The sham exception is not applicable to Hydro–Train if it is one "who 'genuinely seeks to achieve his governmental result but does so through improper means'." *City of Columbia*, 499 U.S. 365, 380, 111 S.Ct. 1344, 1354 (citations omitted). As to whether or not Hydro–Train's actions were "improperly done" (and taking Alaska Cargo's allegations at face value), it is clear to the court that Hydro–Train, through its meetings with ARRC, was seeking governmental action in an attempt to increase its own revenues, albeit at the expense of the competition from Alaska Cargo. It is evident that Hydro–Train's actions in meeting with ARRC employees were genuinely aimed at procuring government action to that effect. There are no allegations which would tend to show the application of the "sham" exception to the doctrine. Given the foregoing, the court concludes the sham exception to the Noerr–Pennington Doctrine does not apply.

The second exception to Noerr–Pennington concerns illegal or fraudulent lobbying activities occurring in a judicial or quasi-judicial setting. Such is not the case here.

Alaska Cargo also claims the existence of a third exception to the doctrine, the so-called "conspiracy exception," because the railroad officials were active participants in the conspiracy. This "conspiracy exception" has been repudiated by the Supreme Court. *See City of Columbia*, 499 U.S. at 382, 111 S.Ct. at 1355.

Hydro–Train's motion to dismiss as it relates to the application of the Noerr–Pennington Doctrine is hereby granted. Based on the foregoing, Alaska Cargo's claims against Hydro–Train for antitrust should be dismissed.

### Local Government Anti–Trust Act

■ ARRC additionally seeks refuge from suit in the Local Government Antitrust

Act of 1984 ("LGAA"). The court is not persuaded. The LGAA (15 U.S.C. § 34) eliminates the damage remedy against local and private persons acting at local governmental direction.[18] Specifically, ARRC claims that it is a "special function governmental unit established by State law" pursuant to 15 U.S.C. § 34(1)(B). The court disagrees based on a review of the legislative history behind the LGAA.

As the House of Representatives report states, in addressing the definition of a "special function governmental units":

> The definition does not include States or their agencies with State-wide jurisdiction. Such entities receive antitrust immunity directly from the "state action" doctrine recognized by the Supreme Court in *Parker v. Brown, supra*, and its progeny. But a political subdivision of a State, established to conduct general or special purpose governmental functions is included. Examples of special purpose political subdivisions included within the definition are planning districts, water districts, sewer districts, irrigation districts, drainage districts, road districts, and mosquito control districts. Such a subdivision would have a geographic jurisdiction that is not contiguous with, and is generally substantially smaller than, that of the state that established it.

H.R.Rep. No. 965, 98th Cong.2d Sess. 19–20, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4602, 4620–21.

The court concludes that ARRC is simply not of the type of "special function governmental unit" that the LGAA was established to protect. It has few, if any, of the attributes which the house report identifies as those requiring protection. ARRC is hardly analogous to a water or mosquito control district. ARRC's motion to dismiss under the LGAA is denied.

### Jurisdiction of the Interstate Commerce Commission

■ Similarly, ARRC and Hydro–Train's claim for dismissal based on the Interstate

---

**18.** Hydro–Train naturally urges that it is also protected by the LGAA as a private party operation in conjunction with ARRC.

Commerce Commission's "primary jurisdiction" also fails. The primary jurisdiction doctrine requires that the ICC be the first to construe a tariff if the construction of the tariff raises issues of transportation policy which require a "uniform and expert administration of the regulatory scheme laid down by [the Interstate Commerce] Act." *United States v. Western Pacific R.R.*, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 778 F.2d 1365 (9th Cir.1985) The doctrine does not apply if the commission has already construed a tariff or clarified the factors underlying the tariff, or if the tariff's language is used in its ordinary sense. *Id.* at 1370

The doctrine is directly applicable to a case where resolution of the issues surrounding the tariff requires consideration of cost allocations or interpretation of previously undefined technical terms. *Id., citing Western Pacific,* 352 U.S. at 69, 77 S.Ct. at 168. This case is not of that type. Here the issues are concerned with anti-trust and breach of contract claims, with Alaska Cargo relying on the alleged failure of ARRC to *award it* different, more favorable rates, as opposed to attacking the validity or the creation of the filed rate itself.[19]

### Keogh Doctrine

Both ARRC and Hydro–Train assert[20] that this case concerns tariff rates, and as such should more properly be before the ICC. Specifically, the movants urge that Alaska Cargo was in reality seeking lower rates and special conditions than those tariff rates for Seward that were published and on file with the ICC. While the defendants find support in *Keogh*, they read the case—and Alaska Cargo's complaint—too narrowly.

*Keogh* stands for the proposition that a private shipper cannot maintain an antitrust cause of action based on rates approved by the ICC. *Berning v. Gooding,* 820 F.2d 1550, 1551 (9th Cir.1987). In *Keogh*, a shipper sought to recover antitrust treble damages for a claim that, but for an alleged conspiracy among carriers concerning establishment of the rates, the shipper would have been entitled to transportation rates lower than the rates which were filed with and approved by the ICC. The Supreme Court dismissed the case, finding that no antitrust remedy was available on a cause of action as to the validity of rates found to be legal by the ICC. *Keogh,* 260 U.S. at 162, 43 S.Ct. at 49. A close reading of Alaska Cargo's complaint reveals that the claims against the defendants are actually aimed at the activities of ARRC in *not* awarding Alaska Cargo the contract more than a dissatisfaction with published rates.

While the court is aware of the fact that ARRC is required by law to abide by the rates filed with the ICC, Alaska Cargo's complaint alleges that ARRC, under the authority granted to it by the Staggers Act, 49 U.S.C. § 10713, *et seq.*, had the power to enter into a special agreement with Alaska Cargo and then failed to do so. In this situation, the *Keogh* argument is inapplicable. While the *Keogh* doctrine has been narrowed to the proposition that an award of treble damages is not an available remedy for a private shipper in actions where the ICC has approved a carrier's rates and a deviation from those rates has allegedly occurred, *Square D Company v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), it has not been construed to prohibit suit on a cause of action filed under the Staggers Act. Indeed, the plaintiff in *Keogh* filed suit because the rates provided by a carrier were allegedly collusive and too high. This case shares none of those attributes.

Alaska Cargo has clearly stated that its complaint does not hinge on the validity of the rates filed by ARRC. The allegations urged by Alaska Cargo against ARRC and Hydro–Train are not levelled at the rates themselves, but at the alleged breach of contract which ARRC had purportedly entered into with Alaska Cargo, and Hydro–Train's

---

19. Alaska Cargo also maintains that under the Staggers Act, 49 U.S.C. § 10713, *et seq.*, railroads are free to enter into contracts that are different than the published rates.

20. *Citing Keogh v. Chicago & Northwestern R.R.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922).

alleged role in coercing ARRC to breach the contract.

ARRC's and Hydro–Train's motion to dismiss as it relates to the dismissal of this case under the *Keogh* doctrine is hereby denied.[21]

### · *Injunctive Relief*

Plaintiff has requested that ARRC, ARRC's employees, and Hydro–Train be permanently enjoined from directly or indirectly continuing the antitrust activities alleged in the complaint. This aspect of plaintiff's complaint is also dismissed.

 The eleventh amendment bars suits by citizens of states against a state and state officials in their official capacity when the relief sought in the form of money damages is retrospective in nature. *Edelman,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). However, it is just as clear that the eleventh amendment is not a bar to suits in federal court for injunctive relief against state officials or state agencies for violations of federal law. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

The court has determined that the state action doctrine prevents application of the federal antitrust statutes to this case. As a consequence, there exists no federal cause of action as to which an injunction could be an appropriate remedy. *Green v. Mansour,* 474 U.S. 64, 71, 106 S.Ct. 423, 427, 88 L.Ed.2d 371 (1985).

### *State Law Claims*

Alaska Cargo has also filed a multiplicity of state law claims against ARRC, ARRC's employees, and Hydro–Train. As a consequence of the court's conclusions on eleventh amendment immunity, the state action doctrine, and the Noerr–Pennington Doctrine, there are no federal claims against the defendants. The state law claims against ARRC and its employees are subject to dismissal. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79

---

21. Similarly, Hydro–Train alleges that Alaska Cargo's complaint is grounded in a claim against unfair rates. This also reads Alaska Cargo's complaint too narrowly. Alaska Cargo is not requesting a determination, more properly made

L.Ed.2d 67 (1984). The state law claims against Hydro–Train are also subject to dismissal because the court lacks complete diversity as between Alaska Cargo and Hydro–Train. *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch.) 267, 2 L.Ed. 435 (1806).

### *CONCLUSION*

Plaintiff's complaint is dismissed in its entirety as to all defendants. The dismissal is with prejudice as to all federal claims, and without prejudice as to pendent state law claims.

by the ICC, that the rates are unreasonably high or that the rates unjustly discriminate against it. It is claiming that the alleged contract, which offered it better rates than those published, was breached.